United States District Court
District of Maine

Samuel M. Luzingu,

        Plaintiff,

    v.

Abbott Laboratories, Inc.,

        Defendant.

No.

**Complaint for Violation of Civil Rights
and Demand for Jury Trial**

    Samuel M. Luzingu brings this employment discrimination complaint for wrongful termination against Abbott Laboratories, Inc. ("Abbott") as follows:

### Summary of the Action

    1.    Mr. Luzingu is an Angolan immigrant who moved to Maine in August 2016 due to political persecution in Angola based on his work as a Christian pastor there.

    2.    Abbott hired Mr. Luzingu in November 2019 to work as a Production Group Leader at its facilities in Westbrook and Scarborough, Maine. In less than a year, he earned two promotions and reached the position of Senior Supervisor (also called Nighttime Flight/Shift Leader) in

1

October 2020. In that job, Mr. Luzingu was overseeing the production of COVID tests.

3.     In February 2021, Mr. Luzingu was praised in his annual performance evaluation as "a key player" who "has worked very hard," "demonstrated leadership & engagement," set "the bar high for his team," and "is a great advocate for his team."

4.     When he was promoted to the Shift Leader position in October 2020, Mr. Luzingu was the only person in the position at the Westbrook and Scarborough locations who was Black, and he supervised many Black Muslim employees on the night shift.

5.     In late 2021, Mr. Luzingu's immediate supervisor changed to Michael Poliquin, who was infected by stereotypes based on the assumed supremacy of white Christians and who lumped together Mr. Luzingu and the other Black employees as second-class foreigners. Mr. Poliquin regularly described other Black employees as Mr. Luzingu's "people" and falsely claimed that Mr. Luzingu only hired team members from Mr. Luzingu's predominantly Black Christian church when in fact most of his Black team members were Muslim and did not attend his church.

6.     Other white supervisors shared Mr. Poliquin's white supremacist views that Mr. Luzingu and other Black employees were inferior because of their race. For example, shift Leader Diane Anderson used racially

2

derogatory comments about Mr. Luzingu and the group he supervised, stating to several other employees that Mr. Luzingu oversaw the "Congo Shift." Abbott ignored a complaint about this racial slur.

7.   On March 31, 2022, Poliquin, complained to Employee Relations (ER) that Mr. Luzingu "is a pastor and shows favoritism to [employees] who are members of his church." Poliquin clearly assumed that all Black African immigrants were "members of Mr. Luzingu's church," including the Muslim employees who Mr. Luzingu tried to help.

8.   On Saturday April 2, 2022, Mr. Luzingu sent an email to Poliquin and other supervisors explaining the adjustment he was making to the break schedule on the 12-hour night shift so the Muslim workers could safely observe their religion during Ramadan, which began on about April 1, 2022. The accommodation was minor; Mr. Luzingu allowed all the Muslim workers to take their normal 40-minute break at the normal first break time of 7:00 pm to enable them to recover from their strict fast—no food or drink, not even water—from sunup to sundown as required by their faith during the month of Ramdan.

9.   Only two days later—on Monday April 4, 2022—Poliquin and other supervisors decided— as documented in an email attaching "Ramdan Coordination"—to recommend Mr. Luzingu's termination. Abbott then declared in its official termination document that it fired supervisor Samuel

3

Luzingu based on his allegedly insubordinate actions accommodating the religious practice of his Black Muslim subordinates contrary to instructions allegedly sent by HR in an email on March 30, 2022.

10.     After a full investigation and a hearing before its five Commissioners, the Maine Human Rights Commission (MHRC) found reasonable grounds to believe that Abbott unlawfully retaliated against Mr. Luzingu because of his protected activity of standing up for the right of the Black Muslim employees to a reasonable accommodation to enable them to safely observe their religious obligations during Ramadan without causing Abbott an undue burden.

11.     In its official Answer to the MHRC, Obbott claimed that it fired Mr. Luzingu because he "was blatantly insubordinate and persisted in violating the Human Resources guidelines by continuing to offer the extended breaks to Muslim employees" Answer at 9. Similarly, it argued that its final reason for firing Mr. Luzingu was his "refusing to follow the explicit guidance of Human Resources," which was allegedly set forth in a March 30, 2022, email from HR.

12.     But Abbott refused to provide this alleged March 30, 2022 HR email to the MHRC or Mr. Luzingu, despite its legal obligations to preserve and produce this record if it exists at all. *Id.* at 1.

## Parties

13.    Mr. Luzingu is a citizen of the United States and is a resident of Westbrook, Cumberland County, Maine. He is an Angolan immigrant who moved to Maine in August 2016 due to political persecution in Angola based on his work as a Christian pastor there.

14.    Abbott is a Delaware corporation and its principal place of business is not in Maine. It has places of business in Cumberland County, Maine, in the towns of Westbrook and Scarborough.

15.     Abbott develops, manufactures, and sells medical devices and diagnostic products. It employs about 114,000 employees and ranks number 107 on the 2025 Fortune 500 rankings of the largest United States corporations by total revenue.

## Jury Trial Demand

16.    Under Federal Rule of Civil Procedure 38, Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

17.    This action arises under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17 (Title VII), The Maine Human Rights Act, 5 M.R.S. §§ 4551-4634 (MHRA), and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831-840 (MWPA).

18.     Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental). Jurisdiction is also proper under 28 U.S.C. § 1332 (diversity) because Mr. Luzingu and Abbott are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mr. Luzingu's claims occurred in Cumberland County, Maine.

20.     Venue is also proper in the District of Maine because Abbott's unlawful employment practices, which violated Title VII, occurred in Maine. 42 U.S.C. § 2000e-5(f)(3).

## Administrative Exhaustion

21.     On February 22, 2023, Mr. Luzingu dual filed a timely charge of discrimination against Abbott with the Maine Human Rights Commission and the U.S. Equal Employment Opportunity Commission (EEOC).

22.     On April 17, 2025, after a full investigation and hearing, the MHRC issued a Statement of Finding that there are reasonable grounds to believe that Abbott discriminated and retaliated against Mr. Luzingu for engaging in protected activity under the MHRA and MWPA. This Statement of Finding further stated: "The Maine Human Rights Act provides that

Complainant may pursue this matter on his/her own within 2 years of the date of alleged discrimination or within 90 days of the notice that conciliation is not successful, whichever date is later."

23.     After the MHRC conducted a mediation and unsuccessfully attempted to conciliate Mr. Luzingu's charge, it issued a notice that conciliation was unsuccessful on July 16, 2025.

24.     Mr. Luzingu requested a right-to-sue notice from the EEOC that the EEOC received on August 8, 2025. Under Title VII, Mr. Luzingu was automatically entitled to receive the requested right-to-sue notice, but the EEOC has not yet issued it.

25.     Mr. Luzingu has exhausted all administrative remedies necessary to pursue the claims asserted in this Complaint.

## Facts

26.     Mr. Luzingu is a Black immigrant from Angola who speaks fluently in English and Portuguese and is conversant in French.

27.     Mr. Luzingu was hired by Abbott as a Production Group Leader on November 18, 2019.

28.     Abbott promoted him to Production Team Leader Nights in May 2020 and then promoted him again to Senior Supervisor (also called

Nighttime Flight/Shift Leader) in October 2020, a position he held until his termination on April 28, 2022.

29.    Mr. Luzingu briefly initially worked in Abbott's Scarborough facility but worked primarily at its Westbrook facility during his employment.

### Abbott managers held racially stereotypical views about Black employees

30.    Many of the employees on the third shift—which was Abbott's term for the night shift—worked under Mr. Luzingu's supervision and were Black immigrants from Africa.

31.    During Mr. Luzingu's tenure at Abbott, the percentage of white employees in supervisory positions at Abbott's Scarborough and Westbrook facilities far exceeded the percentage of white employees in non-supervisory positions at those facilities. This racial hierarchy resulted in a largely Black labor force overseen by an almost entirely white management. Mr. Luzingu was one of the few nonwhite supervisors at the Westbook and Scarborough facilities.

32.    In addition to his work in the production management field, Mr. Luzingu also works as a Christian Pastor at a predominantly Black church.

33.    Mike Poliquin, Mr. Luzingu's white supervisor, harbored negative stereotypes about the Black employees at Abbott.

8

34.    Mr. Poliquin generalized and wrongly assumed that almost every Black employee at Abbott either attended Mr. Luzingu's church or emigrated from the Democratic Republic of the Congo (DRC).

35.    In truth, most of Abbott's Black employees in Maine were Muslim, did not attend Mr. Luzingu's church, and were not from the DRC.

36.    Mr. Poliquin repeatedly made racist comments such as:

a.    Mr. Poliquin falsely claimed that Mr. Luzingu only hired team members from Mr. Luzingu's predominantly Black church.

b.    Mr. Poliquin regularly described other Black employees as Mr. Luzingu's "people."

c.    Mr. Poliquin falsely accused Mr. Luzingu of favoritism toward Black employees.

37.    Mr. Poliquin's false assumptions and accusations against Mr. Luzingu are rooted in negative stereotypes that Black people are essentially indistinguishable and they think the same, act the same, associate with each other outside of work, and attend the same church.[1]

---

[1] *See, e.g.*, Laura Green, *Stereotypes: Negative Racial Stereotypes and Their Effect on Attitudes Toward African-Americans*, Jim Crow Museum, https://jimcrowmuseum.ferris.edu/links/essays/vcu.htm. These stereotypes of African Americans "contribute to a lack of recognition of the diversity and individuality within African American communities, reinforcing systemic racism and impacting intergroup relations." Ward, Annita Marie, *African*

38.     For example, when Mr. Luzingu permitted a Black employee to operate a particular machine, Mr. Poliquin reprimanded Mr. Luzingu and accused him of showing favoritism toward that employee because Mr. Poliquin assumed she was a member of Mr. Luzingu's church. In fact, the employee was not a member of Mr. Luzingu's church.

39.     Mr. Poliquin was not the only white supervisor at Abbott who harbored these negative racial stereotypes about Mr. Luzingu. Several of Mr. Luzingu's other superiors directly questioned Black workers that Mr. Luzingu promoted about whether they were members of his church.

40.     Another Flight/Shift Supervisor, Diane Henderson, made racially derogatory comments about Mr. Luzingu and the group of employees he supervised, stating to several other employees that Mr. Luzingu supervised the "Congo Shift." By calling the third shift the "Congo Shift," Ms. Henderson was derisively grouping dozens of workers from diverse backgrounds into a single second-class ethnic unit solely because the workers were primarily Black and of African descent. Further, she used the phrase "Congo Shift" when criticizing Mr. Luzingu and the employees that he supervised.

---

*American stereotypes* (2024), https://www.ebsco.com/research-starters/social-sciences-and-humanities/african-american-stereotypes.

.

10

41.    Ms. Henderson's comments were highly discriminatory given that, among other things, many of Mr. Luzingu's team members were not from the DRC. She instead lumped all the team members together because they were Black and from Africa, erasing their individual identities and revealing the stereotypical view that all Black people are the same.

42.    One of Mr. Luzingu's employees, Vivian Essangi, complained to Human Resources about Ms. Henderson's racially derogatory comments. But Abbott took no corrective action. Abbott's failure to act on this complaint sent the message that the company condoned her racism.

**Abbott causes Muslim workers to suffer medical emergencies by refusing to accommodate their religiously required strict fasting Ramadan in 2021**

43.    Ramadan is an extremely important month in the Islamic calendar. Muslims (followers of Islam) are expected to observe a strict fast from dawn to sunset abstaining from both eating and drinking, including water, during the month.

44.    The practice of fasting is meant to build a stronger spiritual connection to Allah and remind observants to empathize with those who are less fortunate and to practice charity. Fast is broken at sundown with a prayer and meal known as an iftar.

45.    In 2021, Muslims observed Ramadan from about April 12 to about May 12.

46.     Because of Ramadan's strict fasting rules, many of the practicing Muslims who worked the third shift at Abbott's Westbrook facility started their shift without eating or drinking since dawn.

47.     Throughout the month of Ramdan in 2021, Muslim workers struggled as they worked long overnight hours on a factory floor without eating or drinking until their 40-minute break, which was long enough for them to get to the cafeteria, the only place where Abbott allowed eating and drinking. As a result of the prolonged fast, several Muslim workers became seriously ill and suffered health emergencies due to fasting during the day and then working the night shift without a timely meal break.

**Abbott terminates Mr. Luzingu because he (a) opposed Abbott's failure to accommodate the religious practices of the Muslim employees during Ramdan in April 2022 and (b) provided an appropriate accommodation.**

48.     On March 30, 2022, Mr. Luzingu participated in a meeting with several Abbott employees including Mr. Poliquin, Ms. Henderson, and Sr. Business HR Partner Shawn McCartee.

49.     During the March 30 meeting, Mr. Luzingu criticized Abbott for failing to develop a plan that would accommodate Muslim workers during Ramadan, which was to begin two days later, on April 1, 2022.

50.     Mr. Luzingu reminded Abbott that last year a number of Muslim employees working the third shift who observed Ramadan became ill and

suffered health issues from fatigue due to fasting during the day and then working the night shift.

51.    Mr. Luzingu questioned how Abbott could, in good faith, end the March 30, 2022, meeting without a plan for how to accommodate the Muslim employees on the night shift. In response, Shawn McCartee said, "we will see what we can do."

52.    By March 31, 2022, neither Mr. McCartee nor any other Abbott Human Resources manager came up with a plan for how to accommodate the Muslim employees observing Ramadan.

53.    Abbott's treatment of the Muslim employees stood in stark contrast to its willingness to accommodate employees for reasons other than the Islamic faith, such as employees who received accommodations for medical conditions or workplace injuries.

54.    On April 1, 2022, Mr. Luzingu called Mr. Poliquin and explained that he intended to accommodate Muslim workers by adjusting their work break schedule so that they could eat and pray one hour sooner to mitigate the effects of fasting throughout daylight hours. Mr. Poliquin responded, "do whatever you want to do but make sure we have the numbers [enough people]," or words to that effect.

55.    On April 2, 2022, Mr. Luzingu sent an email which described his plan for adjusting break schedules to accommodate the Muslim employees to,

among others, Mr. Poliquin, Mr. McCartee, and Ms. Henderson. No one told Mr. Luzingu not to move forward with his plan.

56.    Mr. Luzingu and Mr. Poliquin further discussed the break schedule for "people needing to acknowledge Ramadan" in a text message exchange on April 3, 2022. In his text, Mr. Poliquin acknowledged the plan Mr. Luzingu had devised to accommodate the Muslim employees but Mr. Poliquin wanted Mr. Luzingu to clarify a particular detail of the plan. Mr. Luzingu provided that clarification and Mr. Poliquin did not raise any further concerns or seek to change the plan after he received this clarification from Mr. Luzingu.

57.    The accommodation that Mr. Luzingu provided to Muslim employees caused no burden, hardship, or harm to Abbott. In fact, the flight[2] that Mr. Luzingu supervised on the night shift exceeded target unit production from April 1st through 3rd, 2022.

58.    Mr. Luzingu raised his concerns about Abbott's lack of a plan to accommodate the Muslim employees and then, when no one responded to his concerns, developed and implemented a plan himself because he understood that federal and Maine law requires an employer to reasonably accommodate an employee's religious beliefs or practices, such as with flexible scheduling

---

[2] Abbott grouped line workers into "flights" that consisted of "pods" labeled "A," "B," "C," and "D."

and substitutions, unless doing so would cause more than a minimal burden on the operations of the employer's business. He acted because he wanted to ensure that Abbott did not violate these Muslim employees' civil rights nor risk their safety.

59.     Mr. Luzingu also believed that the civil right of the Muslim workers to reasonable accommodation for their religious practices was in accord with his Christian belief in the sanctity of religious freedom and his religious duty to accommodate practicing Muslims under his supervision.

60.     On April 28, 2022, Abbott informed Mr. Luzingu that his position was being eliminated and he was being laid off.

61.     But when Mr. Luzingu later applied for unemployment benefits, Abbott told the Maine Department of Labor that it terminated Mr. Luzingu for poor performance, not because it eliminated his position.

62.     In a Termination Worksheet form in Mr. Luzingu's official personnel file maintained by Abbott, it admitted that it terminated Mr. Luzingu based on his actions to accommodate the religious practice of his Muslim subordinates who were fasting during Ramadan.

63.     According to Abbott's Termination Worksheet, Mr. Luzingu allegedly "chose a different path" than Abbott when he adjusted employees' break schedules to accommodate the Muslim employees during Ramadan. According to Abbott, the schedule adjustment that Mr. Luzingu made for the

Muslim employees conflicted with an alleged March 30, 2022 email directive from Human Resources forbidding supervisors from "restructuring break schedules" to accommodate practicing Muslims (the "alleged March 30 email").

64.    Mr. Luzingu did not receive the alleged March 30 email from Human Resources.

65.    Mr. Poliquin did not mention  the alleged March 30 email when he and Mr. Luzingu discussed adjusting the break schedules for Muslim employees on April 1 or in their text message exchanged on April 3.

66.    Abbott failed to provide the alleged March 30 email in response to Mr. Luzingu's statutory request for his personnel file. Abbott also failed to provide the alleged March 30 email to the MHRC despite its official request for it as part of its statutory investigation under the MHRA.

67.    Abbott was required by law to preserve the alleged March 30 email and its failure to produce it strongly supports the inference that it either does not exist or does not say what Abbott claims.

### Abbott's unenforceable attempt to force a Maine citizen employed in Maine to waive his right to sue for employment discrimination under the Maine Human Rights Act

68.    On or about September 10, 2020, as a condition of his continued employment, Abbott presented an Employment Agreement to Mr. Luzingu

for his signature. Abbott maintains that Mr. Luzingu signed this Employment Agreement but he does not recall whether he did so. The paragraphs below assume, without conceding, that Mr. Luzingu signed the Employment Agreement.

69.    This Employment Agreement was a contract of adhesion. Abbott presented this Employment Agreement to Mr. Luzingu on a take-it-or-leave-it basis. There was no opportunity to negotiate over its terms.

70.    The Employment Agreement is unenforceable because it lacks consideration and is unconscionable. In the Employment Agreement, Abbott reserved "the right to waive the enforcement of any provision(s) in this Agreement, *as well as modify, change, clarify or interpret the Agreement in its sole discretion* but such waiver must be in writing and signed by an ABBOTT Corporate Officer or his/her delegate to be valid." (emphasis added).

71.    Abbott's ability to change the terms of the Employment Agreement at any time and at its sole discretion renders all of Abbott's promises in the Employment Agreement illusory. Because Abbott's promises in the Employment Agreement are illusory, the Employment Agreement lacks consideration. *Canales v. Univ. of Phoenix, Inc.*, 854 F. Supp. 2d 119, 124–25 (D. Me. 2012) and *Millien v. Colby Coll.*, 2005 ME 66, ¶ 9, 874 A.2d 397, 402.

17

72.     Furthermore, the one-sided nature of the Employment Agreement–that allows Abbott to change it anyway it sees fit but does not give Mr. Luzingu the same right–renders it unconscionable.

73.     The Employment Agreement contains a Choice of Law provision which states as follows: "This Agreement shall be construed, and its enforceability and the relationship of the parties shall be determined, in all respects under the laws of Illinois, without giving effect to conflict of laws."

74.     Abbott included this same Choice of Law provision in Employment Agreements that it required other employees to sign. In other lawsuits, Abbott has argued that this Choice of Law provision precluded the plaintiffs from bringing employment discrimination claims against Abbott under the law of any state other than Illinois.

75.     While this Choice of Law provision states that the Employment Agreement shall be construed under the laws of Illinois, the Court must use Maine law to determine whether a valid enforceable contract was formed in the first place. *Kaur v. World Bus. Lenders, LLC*, 440 F. Supp. 3d 111, 117 (D. Mass. 2020) (*citing Northeast Data Sys. v. McDonnell Douglas Computer Sys.*, 986 F.2d 607, 611 (1st Cir. 1993)).

76.     Among other reasons, Maine law is appropriately applied here because of the following factors:

a.     Mr. Luzingu was working in Maine when the Employment

18

Agreement was presented to him and when it was allegedly formed.

b.     The Employment Agreement governed Mr. Luzingu's

employment and he worked and resided, throughout the entire duration of

his employment, in Maine.

c.     Abbott took the discriminatory and retaliatory acts against

Mr. Luzingu in Maine. Abbott notified him of his termination in Maine at its

Westbrook facility. *See State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44,

¶¶ 21- 22 and 46-47 (Me. 2010) (discussion of Maine's choice of law rules).

### Abbott's unenforceable attempt to force Mr. Luzingu to bring his claims 1,000 miles away in Illinois

77.     The Employment Agreement also includes the following

"Jurisdiction/Venue" provision:

> The parties agree to the exclusive jurisdiction of the state and federal
> courts in Illinois, in any action or proceeding arising out of or relating
> to this Agreement or the transactions contemplated hereby, and further
> irrevocably agree that all claims in any such action or proceeding shall
> be heard and determined in Lake County, Illinois state court or the
> Northern District of Illinois federal court. Both parties waive any
> objection to the laying of venue of any such action or proceeding in any
> of the Lake County, Illinois state courts or Northern District of Illinois
> federal courts, as well as any claim that a party may have that any
> such action or proceeding has been brought in an inconvenient forum.
> EMPLOYEE stipulates and consents to Illinois courts' personal
> jurisdiction and waives the right to object to an Illinois court's
> jurisdiction.

78.     Abbott included this same Jurisdiction/Venue provision in

Employment Agreements that it required other employees to sign. In other

employment discrimination lawsuits against Abbott, Abbott has relied on this Jurisdiction/Venue provision to argue that its former employees must pursue their claims against Abbott in Illinois even if they were employed in Maine.

79.    This Jurisdiction/Venue provision is unenforceable because, as discussed above, the Employment Agreement is unenforceable in its entirety. Additionally, the Jurisdiction/Venue provision is unenforceable because it violates public policy and federal law.

80.    Title VII has a special venue provision which states, in pertinent part, that a Title VII "action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office." 42 U.S.C. § 2000e-5(f)(3).

81.    In *Dumont v. PepsiCo, Inc.*, this Court held that when a protective statute has a special venue provision, it would be contrary to public policy to enforce a contractual agreement that requires the plaintiff, over his wishes, to file his lawsuit in the defendant's chosen venue. 192 F. Supp. 3d 209, 219-20 (D. Me. 2016).

82.     While *Dumont* involved an ERISA claim, other courts have followed this same approach under Title VII and § 1981.[3] Particularly in a case like this, in which the plaintiff has the right to a jury, it would contravene public policy to force the plaintiff to bring his claims in a state over 1,000 miles away. Federal civil rights laws favor having a jury from Maine, not Illinois, determine whether unlawful discrimination occurred in Maine. *Sepanski v. Janiking, Inc.*, 822 F. Supp. 2d 309, 315–16 (W.D.N.Y. 2011) (refusing to enforce forum selection clause in Title VII case, in part, because "the private attorney general is entitled to have the local residents play the part of fact-finder in determining whether or not defendant's actions were inimical to" the goals of Title VII). The same reasoning should similarly apply to the MHRA and MWPA.

83.     The Court also should not enforce the Jurisdiction/Venue provision because of the undue hardship it would impose on Mr. Luzingu to pursue his claims in this case.

84.     Mr. Luzingu lives in Westbrook, Maine, and litigating this action in the Northern District of Illinois—about 1,000 miles away—would impose a serious hardship on him. It would be unreasonably costly and difficult for Mr.

---

[3] *See e.g., Red Bull Assocs. v. Best W. Int'l, Inc.*, 862 F.2d 963, 967 (2d Cir. 1988) (§ 1981); *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 959 (M.D. Tenn. 2008) (Title VII); *Thomas v. Rehab. Servs. of Columbus, Inc.*, 45 F. Supp. 2d 1375, 1381 (M.D. Ga. 1999) (Title VII).

Luzingu to travel to Illinois for a deposition or jury trial for, among other things, the following reasons:

a.    Mr. Luzingu is the sole breadwinner in his household of six and his family lives paycheck to paycheck. The added costs associated with traveling to and staying in Illinois for a deposition or trial would impose an unreasonable burden on the financial stability of his family.

b.    Mr. Luzingu has four children under the age of 15, and he would not be able to fulfill his childcare responsibilities while traveling to and staying in Illinois for a deposition or trial.

c.    As the sole pastor at his church, among other activities, Mr. Luzingu leads three services per week that run from around 6:00 pm to 8:00 pm. Traveling to Illinois for a deposition or trial would make it far more difficult for him to fulfill his pastoral duties than if the deposition or trial occurred in Maine.

85.    The key witnesses in this case either live in Maine or do not live in Illinois, including Mr. Poliquin, Ms. Henderson, and Ms. Essangi. It would be difficult for Mr. Luzingu to present testimony from these witnesses at a trial in Illinois.

## Legal Claims of Employment Discrimination

86.    The allegations in the preceding paragraphs are realleged.

87.    Abbott engaged in discriminatory practices—including wrongful discharge—against Mr. Luzingu because of his race and in retaliation for his protected activity in violation of 42 U.S.C § 1981, Title VII, MHRA, and MWPA.

88.    Abbott retaliated against Mr. Luzingu for engaging in protected activities including: (a) speaking out about Abbott's obligation to provide reasonable accommodations to Muslim employees for their religious beliefs and practices while they were observing Ramadan; (b) opposing Abbott's unlawful denial of reasonable accommodations for the religious beliefs and practices of Muslim employees during Ramadan; and (3) providing reasonable accommodation to Muslim employees for their religious beliefs and practices while they were observing Ramadan. These reasonable accommodations must be provided under Title VII (42 U.S.C. § 2000e(j)) and the MHRA (94-348 C.M.R. ch. 3 § 14(2)). Abbott's retaliation against Mr. Luzingu for engaging in these protected activities violated Title VII, MHRA, and MWPA.

89.    Abbott's denial of reasonable accommodations to Muslim employees also constituted race discrimination. Abbott routinely offered accommodations for employees who, for instance, suffered injuries in the workplace or had other types of medical conditions. Abbott was disinterested in accommodating Muslim employees because the reason for the accommodation was their Muslim faith, which is considered a race under civil

23

rights laws. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Thus, Mr. Luzingu opposed race discrimination when he opposed Abbott's refusal to provide reasonable accommodations to Muslim employees and, accordingly, Abbott violated Title VII, MHRA, MWPA, and § 1981 when it retaliated against him for opposing its race discrimination.

90.    Abbott also discriminated against Mr. Luzingu on the basis of his race. Because of the racist stereotype that Black people stick together and are all the same, Abbott believed that Mr. Luzingu was too likely to side with Abbott's Black employees—including the predominantly Black Muslim employees who Mr. Luzingu accommodated for Ramadan—when those Black employees had a disagreement with management. Abbott terminated Mr. Luzingu, at least in part, because of this racist stereotype.

91.    As a direct and proximate result of Abbott's retaliation and discrimination, Mr. Luzingu suffered damages including, but not limited to, lost pay and benefits, inconvenience, injury to reputation, and loss of enjoyment of life.

92.    Abbott acted intentionally, maliciously, and with reckless disregard for and indifference to Mr. Luzingu's rights under § 1981, Title VII, the MHRA, and the MWPA.

93.    The law does not require Mr. Luzingu to prove that "the employer consciously intended" to discriminate but allows him to prevail based solely

on showing implicit, unthinking, or unconscious stereotype or bias. *Burns v. Johnson*, 829 F.3d 1, 13 (1st Cir. 2016).

94. Mr. Luzingu reserves his right to pursue all possible methods of proving his legal claims including, but not limited to, unthinking stereotype, unconscious bias, unthinking bias, or implicit bias; circumstantial and direct evidence; pretext evidence; as well as causation based on one or more discriminatory or unlawful but-for causal factors along with other non-discriminatory or lawful but-for causal factors; a single discriminatory or unlawful motive or cause; or mixed motives or but-for causes, including at least one discriminatory or unlawful motive or motivating factor.

95. Mr. Luzingu's race or protected activity "need not be the sole or primary cause of the employer's adverse action," and "[i]t doesn't matter if other factors besides the plaintiff's [protected status] contributed to the decision." *Bostock v. Clayton Cty., Georgia*, 590 U.S. 644, 656-59 (2020). "Often, events have multiple but-for causes" and, thus, plaintiffs need only show that an adverse action was "based in part" on their protected status to prove a sufficient but-for factor of causation under § 1981, Title VII, MHRA, and MWPA. *Id.* at 656, 659 (explaining meaning of statutory language "because of" in Title VII).

96. Mr. Luzingu requests relief against Abbott as follows:

(a)     Enter declaratory relief that Abbott violated Mr. Luzingu's statutory civil rights to be free of unlawful race discrimination and retaliation;

(b)     Enter injunctive relief ordering Abbott to

    (i)     reform and correct the plaintiff's official personnel file and all personnel records of Abbott to void the April 2022 termination of the plaintiff because it was illegal (*Alavi v. Bennett*, No. CV 15-2146 (RBW), 2024 WL 5056204, at *10 (D.D.C. Dec. 10, 2024));

    (ii)     remove "all records that support, evidence[,] or refer to the termination of [the plaintiff] or its rationale." (*Id.*);

    (iii)     submit to the plaintiff an updated version of the plaintiff's Official Personnel File. (*Id.* (citing *Craig v. Mnuchin*, CV 14-1340 (RC), 2018 WL 6079512, at *10 (D.D.C. Nov. 21, 2018) (imposing a requirement identical to that which the Court orders in this case to ensure compliance with the personnel record-related relief ordered by the court)).

(c)     Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(d)     Award punitive damages in amounts to be determined at a trial by the jury and prejudgment interest thereon;

26

(e)    Award Mr. Luzingu back pay for lost wages and benefits and

prejudgment interest;

(f)    Reinstate Mr. Luzingu to his position, or, instead, award front

pay for future lost wages and benefits;

(g)    Award Mr. Luzingu full costs and reasonable attorney's fees,

including full litigation expenses;

(h)    Award nominal damages if the jury awards no compensatory

damages; and

(i)    Award such further relief as is deemed appropriate.

Respectfully submitted,


Date: October 14, 2025                    /s/ David G. Webbert
                                          David G. Webbert
                                          Johnson & Webbert, LLP
                                          1 Bowdoin Mill Island, Ste 300
                                          (207) 623-5110
                                          dwebbert@work.law


                                          /s/ Allan K. Townsend
                                          Allan K. Townsend
                                          Johnson& Webbert, LLP
                                          1 Bowdoin Mill Island, Ste 300
                                          Topsham, ME 04086
                                          (207) 623-5110
                                          atownsend@work.law

27

/s/ Ryan M. Schmitz
Ryan M. Schmitz
Johnson& Webbert, LLP
1 Bowdoin Mill Island, Ste 300
Topsham, ME 04086
(207) 623-5110
rschmitz@work.law

*Attorneys for Plaintiff*