United States District Court
District of Maine

| |
|---|
| Samuel M. Luzingu, |
| Plaintiff, |
| v. |
| Abbott Laboratories, Inc., |
| Defendant. |

No. 2:25-cv-00523-LEW

**Plaintiff's Objection to Defendant's Motion to Dismiss or to Transfer Venue**

Abbott's motion to dismiss or transfer this case to Illinois, based on the forum-selection clause (FSC) in its Employee Agreement, should be denied because its argument rests on a major error of law. Abbott's motion does not mention, much less address, a controlling authority: *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972). In *Bremen*, the Supreme Court laid out a four-factor analysis to determine whether an FSC is valid. This threshold legal issue must be decided first under *Bremen*, and if the court finds that the FSC is invalid, it need not even consider the separate and derivative issue of whether "a valid forum-selection clause" warrants transferring the case to the forum specified in that clause under the *forum non conveniens* standards set forth in *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Texas*, 571 U.S. 49 (2013).

Because Abbott's motion leapfrogs the mandatory *Bremen* analysis for determining whether its FSC is valid, its motion to transfer based on that clause is legally defective and must be denied on that ground alone. *See, e.g., AQuate II LLC v. Myers*, 100 F.4th 1316, 1324 (11th Cir. 2024) (reversing district court for granting motion to transfer based on an FSC when it failed to consider "the validity and enforceability of the forum-selection clause under *Bremen* before

1

moving on to the *forum non conveniens* analysis"). Indeed, it is well established that "[f]ederal courts cannot sidestep [their] responsibility to consider this question under *Bremen* before applying the *forum non conveniens* inquiry as directed by *Atlantic Marine*." *Id.* at 1323 (relying on rulings of "[m]any other circuits [that] have followed the same approach," including the Third, Sixth, Seventh, Ninth, and D.C. Circuits).[1]

And the First Circuit has recently repeatedly followed this same approach of applying the four-factor analysis in *Bremen* to determine whether an FSC is valid and enforceable. *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 33 (1st Cir. 2022); *Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 48-49 (1st Cir. 2014). As the First Circuit explained in *Amyndas*, "even if a [FSC] is mandatory and unambiguous. . . a court may decline to enforce it if the resisting party can show that doing so would be 'unreasonable'" under the four factor analysis articulated in *Bremen*. *Amyndas*, 48 F.4th at 33. And the four factors for assessing validity and enforceability under *Bremen* are separate from the additional inquiry about the "public interest factors under the doctrine of forum non conveniens [that] may sometimes provide support for rejecting enforcement of an otherwise valid [FSC]" as set forth in *Atlantic Marine*. *Id.*

As articulated by the First Circuit in *Amyndas*, the four *Bremen* "grounds for deeming a forum-selection clause to be unenforceable" are: (1) the clause derives from "fraud or overreaching"; (2) enforcing the clause "would be unreasonable and unjust"; (3) "proceedings in the contractual forum will be so gravely difficult and inconvenient that the party challenging the clause will for all practical purposes be deprived of his day in court"; and (4) enforcing the clause

---

[1] *See also Black Hills Truck & Trailer, Inc. v. MAC Trailer Mfg., Inc.*, No. CIV. 13-4113-KES, 2014 WL 5782452, at *4 (D.S.D. Nov. 6, 2014) (listing cases that hold that *Bremen* validity and enforceability analysis is the mandatory first step in judging whether to uphold an FSC in the context of a motion to transfer venue).

would "contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." 48 F.4th at 33 (quoting *Claudio-de Leon* quoting *Bremen*).

Abbott's motion does not address the mandatory *Bremen* framework, and Abbott may not do so for the first time in its reply brief. *See, e.g.*, *Goldenson v. Steffens*, No. 2:10-CV-00440-JAW, 2013 WL 145587, at *9 (D. Me. Jan. 14, 2013) (movants waived argument made for the first time in reply brief even though they were responding to an issue first raised by non-movants because the movants "could and should have raised the issue in the first instance" (citation modified)); *Yankee Exports, Inc. v. Ray*, No. 99-29-P-H, 1999 WL 33117119, at *3 (D. Me. June 12, 1999) ("Issues raised for the first time in reply memoranda will not be considered by this court.").

Thus, Abbott's waiver of the mandatory *Bremen* analysis regarding the enforceability of its FSC renders Abbott's motion fatally defective. But, out of an abundance of caution, this objection demonstrates why *Bremen*'s four-factor analysis renders Abbott's FSC invalid and unenforceable.

**First**, under *Bremen* factors 2 and 4, enforcement would be both "unreasonable and unjust" and "contravene a strong public policy of the forum in which suit is brought" (Maine) because (a) Mr. Luzingu is the sole ministerial Pastor for a Christian Church in Westbrook, Maine, and its parishioners depend on him to provide daily religious counselling and services essential to both their and Mr. Luzingu's constitutional right to the free exercise of religious freedom; and (b) denying Mr. Luzingu his explicit right under Title VII to sue Abbott in Maine where he worked, where the discrimination occurred, and where his case was litigated administratively before the Maine Human Rights Commission and instead making him pursue his case over 1,000 miles away from his home and former workplace flies in the face of the strong public policy enshrined in Title VII of promoting actions by private attorneys general to enforce Title VII's purpose to eradicate

unlawful discrimination from all places of employment. *See* Declaration of Samuel M. Luzingu ¶¶ 32- 44.

**Second**, under *Bremen* factor 1, Abbott's incorporation of the FSC into the Employee Agreement ("Agreement") was the result of "overreaching" including (a) the unnecessary use of legal jargon—like "exclusive jurisdiction" and the "laying of venue"—that was not in plain English nor calculated to be understandable to the average Abbott employe much less a recent immigrant like Mr. Luzingu for whom English was a new, second language, *see* Luzingu Decl. ¶ 29; and (b) a reservation of the right "to change" the Agreement "in its sole discretion," which enables Abbott to choose whether to litigate in Illinois or not.

**Third**, under *Bremen* factor 4, a trial in Illinois will be so difficult and inconvenient that Mr. Luzingu "will for all practical purposes be deprived of his day in court" because he is the sole breadwinner for his wife and four minor children; his family is already struggling financially because his annual pay is only $40,000 and thus he would likely be unable to manage the additional burdens of litigating this case over 1,000 miles away including having to find, pay for, and develop confidence in new lawyers and pay for travel and lodging while in Illinois. Luzingu Decl. ¶¶ 48- 51.

Finally, in addition to failing under *Bremen*, the FSC is also unenforceable because Abbott's reservation of the right to "change" the Agreement renders all its promises in the Agreement illusory, and thus no contract was formed in the first place.

While this Court recently enforced the FSC at issue here in two other cases, *Mayhew v. Abbott Laboratories, Inc.*, 2:25-cv-00076, 2026 WL 323175 (D. Me. Feb. 6, 2026), and *Campinell v. Abbott Laboratories, Inc.*, 2:25-cv-00072, 2026 WL 323157 (D. Me. Feb. 6, 2026) (hereafter referenced jointly as "*Mayhew*"), Mr. Luzingu has made significantly different legal arguments

4

than were presented to the Court in those cases and the facts here relevant to the *Bremen* analysis are also significantly different.

**Facts**

Plaintiff Samuel Luzingu is the sole ministering Pastor at Rhema Christian Church Ministries in Westbrook, Maine; he leads all Church services, counsels parishioners, organizes community services, and oversees Church employees. Luzingu Decl. ¶ 32; Complaint at ¶ 84(c). His typical weekly schedule with the Church is packed full:

- o Sunday: services from 10am-2pm and 5pm-7:30pm

- o Monday: intercession (praying for the sick, needy) from 2pm-6pm- attendees are usually in extreme need of religious support and comfort

- o Wednesday: counseling for parishioners and office hours from 9am-5pm; bible study from 5pm-8pm

- o Thursday: community services from 8am-5pm or later

- o Friday: Preparation for food pantries from 7am-6pm

- o Saturday: Preparing brochures, announcements, choir, sermons, etc. for Sunday.

Luzingu Decl. ¶ 34. Mr. Luzingu is often called to attend to other Church business on Tuesdays, his one day off. *Id.* ¶ 35. In short, Mr. Luzingu is essential to the functioning and daily operation of his Church.

Before immigrating to Maine in 2016, Mr. Luzingu had been the leader of a Christian Church in his native country of Angola until he was forced to flee for his life due to religious persecution. Luzingu Decl. ¶ 13. After a long legal process, he was officially granted asylum by the United States in 2025. *Id.* ¶ 14. The majority of Mr. Luzingu's parishioners are also immigrants from Central Africa who have pending applications for asylum. *Id.* ¶ 37. Since January 2026, when ICE began targeting recent immigrants to southern Maine from Central Africa for detention, Mr.

Luzingu's parishioners have grown even more dependent on him for religious and counselling support, including visiting them at their homes because they are afraid to go out. *Id.* ¶¶ 38-44.

Before working full time as a Pastor in Maine, Mr. Luzingu was a Nighttime Flight/Shift Leader for Abbott. He was fired in April 2022 because he made a minor adjustment in the eating break schedule during Ramadan to accommodate the religious practices of the Black Muslim workers he supervised. Mr. Luzingu made this temporary accommodation, which had no adverse effect on productivity, with the advance consent of his immediate supervisor, and because the prior year when Abbott failed to make an accommodation many of his Black Muslim workers became seriously ill. *See* Complaint at ¶¶ 43-67. After a thorough investigation, the Maine Human Rights Commission found reasonable grounds to believe that Abbott had violated Mr. Luzingu's rights. *Id.* at ¶ 22.

Consistent with its nationwide practice, Abbott required Mr. Luzingu to sign an Employee Agreement ("Agreement") as a condition of his employment. *See* Ex. 1; *see also* Luzingu Decl. ¶ 24. Abbott offered this Agreement to Mr. Luzingu on a take-it-or-leave-it basis. *See id.* ¶¶ 26-27. The Agreement includes an FSC that, if enforced, would require Mr. Luzingu to litigate his claims against Abbott in Illinois. *See* Ex. 1 at § 16. Among other hardships, forcing Mr. Luzingu to litigate his claims in Illinois would infringe on his religious freedom and the religious freedom of the over 80 worshipers who rely on Mr. Luzingu's church. Mr. Luzingu is also the sole breadwinner in his household of eight, and his family lives paycheck to paycheck. Luzingu Decl. ¶¶ 7, 48. The major added costs and burdens associated with pursuing his case in Illinois—such as finding and paying for new lawyers with expertise in prosecuting employment discrimination cases in Illinois, and traveling to and staying in Illinois for depositions, hearings, and trial—would impose a significant burden on the financial stability of his family. *Id.* ¶ 51.

**Legal Standard for Scope of the Factual Record**

As Abbott concedes, on its motion to transfer venue, the Court is not confined to the four corners of the Complaint. ECF No. 7 at 4. But on its motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), the Court is confined to considering the plausibility of the allegations in the Complaint and any documents incorporated into the Complaint by reference. *Id.*

**Argument**

**I.      The FSC is unenforceable under the *Bremen* four-factor analysis.**

Under *Bremen*, courts decline to enforce FSCs on four grounds: (1) the FSC "derives from 'fraud or overreaching;'"; (2) enforcement would be "unreasonable and unjust"; (3) litigating "in the contractual forum will be so gravely difficult and inconvenient that the party challenging the [FSC] will for all practical purposes be deprived of his day in court;" and (4) enforcement would "contravene a strong public policy of the forum in which suit is brought." *Amyndas,* 48 F.4th at 33 (articulating the four *Bremen* factors). Courts consider these four factors in combination with each other, not in isolation, when they rule on the enforceability of an FSC. *DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, 28 F.4th 956, 966 (9th Cir. 2022). The four factors all weigh against enforcement of the FSC here, and when combined, they make an especially strong case for non-enforcement.

**First**, under the second and fourth *Bremen* factors, enforcement of the FSC would be unreasonable and unjust and contravene a strong public policy of Maine because (a) Mr. Luzingu's daily presence in Maine is essential to the free exercise of religion by the over 80 parishioners at his Christian Church in Westbrook, Maine, who count on him to provide daily religious counselling and services; and (b) forcing Mr. Luzingu to travel over 1,000 miles from his home

7

and former place of work for Abbott flies in the face of Congress' goal of easing the path for private attorneys general to enforce Title VII by giving plaintiffs the right to sue.

**Second**, under the first *Bremen* factor, the FSC's incorporation into the Agreement was the result of "overreaching" including (a) the unnecessary use of legal jargon—like "exclusive jurisdiction" and the "laying of venue"—that was not in plain English nor calculated to be understandable to the average Abbott employe much less a recent immigrant like Mr. Luzingu for whom English was a new, second language; and (b) a reservation of the right to "change" the FSC in its "sole discretion," *see* Ex. 1 at § 19.

**Third**, under the third *Bremen* factor, litigating in Illinois "will be so gravely difficult and inconvenient that" Mr. Luzingu "will for all practical purposes be deprived of his day in court." *Bremen*, 407 U.S. at 18; *see also Amyndas,* 48 F.4th at 33 (discussing *Bremen* factors).

**A. The FSC is unenforceable because enforcing it would be "unreasonable and unjust" and would infringe on the strong public policy of the State of Maine and the United States in favor of the free exercise of religion.**

As the sole ministering pastor at his Church, requiring Mr. Luzingu to travel to Illinois to pursue his case would undermine both his and his parishioners' exercise of their religious beliefs and practices. Such an outcome would be both "unreasonable and unjust" and "contravene a strong public policy" of Maine and the United States because it would infringe on (1) the foundational public policy to ensure the free exercise of religion of its people and (2) Mr. Luzingu's right to freely exercise his religion, in violation of the Maine Civil Rights Act (MCRA).[2]

---

[2] Even though Mr. Luzingu raised the freedom of religion ground for not enforcing the FSC in his Complaint at ¶ 84(c), Abbott chose not to address it in its motion to dismiss.

**1. Enforcing the FSC would contravene the strong public policy of ensuring the free exercise of religion.**

If forced to travel to Illinois for trial, depositions, hearings, and other proceedings in this case, the freedom of exercise of religion of both Mr. Luzingu and his Church's approximately 85 parishioners will be substantially burdened. Our "Nation's essential commitment to religious freedom" is embodied in the First Amendment's Free Exercise clause.[3] *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524 (1993). And the Religious Freedom Restoration Act embodies Congress' determination that a strong public policy demands protecting religious liberty even more broadly than the First Amendment requires. *See Holt v. Hobbs*, 574 U.S. 352, 356 (2015). Protecting religious liberty requires more than merely protecting the "right to harbor religious beliefs inwardly and secretly." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). It requires the protection of "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Id.*

If forced to travel to Illinois for a trial, depositions, and other court proceedings, Mr. Luzingu could not lead his parishioners' religious practices. Luzingu Decl. ¶ 44. This would burden not only these parishioners' religious practices but Mr. Luzingu's, too, since leading his parishioners' religious practices is a key part of his own religious practice. In effect, while Mr. Luzingu is in Illinois, the church—which serves as the religious home for dozens of parishioners and a pillar of charitable aid in the community—would shut down. *Id.* ¶ 33.

Every week, Mr. Luzingu works full-time—with official duties scheduled six days every week—as the sole ministerial pastor of his church, attending to his parishioners' religious and spiritual needs. *Id.* ¶ 34. As pastor, it is Mr. Luzingu's divinely ordained calling to lead his parishioners in their religious practice. *Id.* ¶¶ 5-10. Traveling to Illinois for even a few days

---

[3] Maine too enshrined religious freedom as a core principle of its Constitution. *See* Me. Const. art. I, § 3.

would severely disrupt Mr. Luzingu's religious practice schedule. *Id.* ¶¶ 33, 44. If the case were not transferred, Mr. Luzingu would not have to miss any of his normal religious practices because the parties could schedule his deposition for a Tuesday when he does not lead religious practices. *Id.* ¶ 35. But if he had to travel to Illinois for his deposition, he would need to be out of state for at least two to three days and have to miss leading his parishioners' religious rites, rituals, and practices. *Id.* ¶¶ 32, 44. If the trial took place in Maine, Mr. Luzingu would not need to miss Sunday services or events on weekday evenings. Traveling to Illinois for a week or more for trial would cause a far more serious disruption to his and his parishioners' religious practices, since he would need to set aside time to travel to and from Illinois, and he would miss all the evening religious practices that he could have attended had the trial occurred in Maine. Mr. Luzingu may even need to miss Sunday services, the most fundamental responsibility of his position, so that he could travel to Illinois. *Id.* ¶¶ 32-35, 44

The next few years are likely to be one of the worst times for Mr. Luzingu to be unable to fulfill his pastoral duties. *Id.* ¶ 42. Most of the parishioners who attend Mr. Luzingu's church are immigrants from Central Africa who have pending asylum applications. *Id.* ¶ 37. Many of his parishioners live in fear of immigration enforcement officers, and some have even been detained in immigration detention facilities, despite having no criminal record. *Id.* ¶¶ 37-43. Since January 2026, Mr. Luzingu has provided nearly round-the-clock religious support and comfort to these parishioners and their families. *Id.* If forced to travel to Illinois for this case, Mr. Luzingu would not be able to attend to these parishioners' or their families' religious needs at a time when they desperately need it. *Id.* ¶

Given the compelling public interest in ensuring that people can freely exercise their religion, it would be unreasonable and unjust to require Mr. Luzingu to choose between pursuing

his discrimination and retaliation claims and fulfilling his pastoral duties. *See Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 140 (1987) (state could not force plaintiff to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand"). This Court should refuse to enforce the FSC to uphold the strong public policy in ensuring that Mr. Luzingu and his parishioners may freely exercise their religion.

### 2. If enforced, the FSC would contravene the strong public policy of Maine established by the MCRA.

Enforcement of the FSC would burden Mr. Luzingu's religious practices in a way that would cause him and any reasonable person in his position to suffer emotional distress, and thus would contravene Mr. Luzingu's First Amendment rights under the MCRA. 5 M.R.S. § 4682(1-A). The MCRA prohibits "any person" from violating an individual's constitutional rights, regardless of whether that person is a governmental entity, when the violation would cause a reasonable person to suffer emotional distress.[4] The MCRA represents a "strong public policy" of Maine, and it would be "unreasonable and unjust" to permit Abbott to undermine the strong policy of the MCRA by requiring Mr. Luzingu to pursue his case in Illinois to the detriment of his role as the sole ministerial pastor of his Church in Maine.

An individual can prove a First Amendment free exercise violation by showing a burden to his religious practice "pursuant to a policy that is not neutral or generally applicable." *Kennedy*,

---

[4] *Murray v. Murray*, No. CV-05-161, 2006 WL 5255496 (Me. Super. Ct. Dec. 13, 2006) (plaintiff could pursue MCRA claim against private individual for actions that interfered with her rights under Maine's Constitution and statute). Maine's Legislature expanded the MCRA in 2023 to include a cause of action when a plaintiff reasonably suffered emotional distress because of the defendant's actions. 2023 Me. Legis. Serv. Ch. 287 (S.P. 365) (L.D. 868). As discussed above, enforcing the FSC would cause a "reasonable person" in Mr. Luzingu's position to suffer "emotional distress." 5 M.R.S.A. § 4682(1-A)(B)(5). If required to leave his parishioners without their spiritual leader, Mr. Luzingu would be constantly worried about them, anxious about how they are coping without him, and tormented by the understanding that, without the church, their spiritual needs are going unmet. *See* Luzingu Decl. ¶¶ 46-47.

11

597 U.S. at 525 (citation modified). A policy is not generally applicable if it includes a "mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021). Such a mechanism renders a policy not generally applicable, regardless of whether or how exceptions are granted in practice, because the possibility for exceptions invites the policymaker to decide "which reasons for not complying with the policy are worthy of solicitude." *Id.* at 537. The *Fulton* court held that a contract between the City of Philadelphia and foster parents that prohibited discrimination based on sexual orientation unless the City granted an exception to that requirement under its "sole discretion" was not generally applicable. *Fulton*, 593 U.S. at 535.

The Agreement in this case is not generally applicable because it includes a mechanism for individual exceptions like the contractual mechanism in *Fulton*—a "Waiver" provision that enables Abbott, in its "sole discretion," to "waive the enforcement" of any provision in the Agreement, including the FSC. *See* Ex. 1 at § 19. When a policy unconstitutionally burdens an individual's free exercise rights, the defendant can escape liability only if it can show that the policy "advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (quotation omitted). In other words, if Abbott could "achieve its interests in a manner that does not burden [Mr. Luzingu's] religion, it must do so." *Id.* Abbott is obviously able to litigate this case in Maine and has no compelling interest in forcing Mr. Luzingu, who it employed in Maine, to litigate 1,000 miles away in northern Illinois. Thus the Court should deny Abbott's motion because enforcement of the FSC would violate Mr. Luzingu's rights under the MCRA.

**B. Enforcing the FSC would be "unreasonable and unjust" and would contravene the strong public policies that underlie Title VII.**

Congress designed Title VII to empower private plaintiffs to serve as "private attorney[s] general" who protect the public policies that underlie Title VII. *Garcia v. State Ins. Fund Corp.*,

169 F.4th 13, 31 (1st Cir. 2026) (citation omitted). Private attorneys general not only vindicate their own rights but, through their claims and lawsuits, also deter other employers who may otherwise engage in invidious discrimination.

Title VII's special venue provision, 42 U.S.C. § 2000e-5(f)(3), plays a key part in fulfilling this Congressional purpose. It allows a plaintiff to file suit "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(f)(3). Title VII's "broad" special venue provision is designed to fulfill "the desire of Congress to afford citizens full and easy redress of civil rights grievances." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 504 (9th Cir. 2000).

To prevent companies from undermining Congress's desire to afford private attorneys general the ability to fully and easily redress their civil rights complaints, courts around the country have invalidated FSCs that require plaintiffs to litigate their Title VII and other civil rights claims in faraway forums.[5] These courts have focused primarily on two public policies that FSCs undermine. First, courts recognize that "public policy would obviously be hindered by enforcing a contract which would prevent or seriously discourage the pursuit" of civil rights claims. *Red Bull Assocs. v. Best W. Int'l, Inc.*, 862 F.2d 963, 966 (2d Cir. 1988); *see also Thomas v. Rehab. Servs. of Columbus, Inc.*, 45 F. Supp. 2d 1375, 1381 (M.D. Ga. 1999). Second, courts recognize that

---

[5] *See e.g., Red Bull Assocs. v. Best W. Int'l, Inc.*, 862 F.2d 963, 967 (2d Cir. 1988); *Thomas v. Rehab. Servs. of Columbus, Inc.*, 45 F. Supp. 2d 1375, 1381 (M.D. Ga. 1999); *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 959 (M.D. Tenn. 2008); *Sepanski v. Janiking, Inc.*, 822 F. Supp. 2d 309, 315–16 (W.D.N.Y. 2011); *Luderus v. U.S. Helicopters, Inc.*, No. 12-CV-5094, 2013 WL 677814, at *4 (N.D. Ill. Feb. 25, 2013); *Blazer v. Buddy Gregg Motor Homes, LLC*, No. 3:18-CV-00097, 2019 WL 13298940, at *2 (E.D. Tenn. Dec. 19, 2019).

litigating civil rights claims where the alleged discrimination occurred, as opposed to where the FSC directs, advances the public's interest because jurors who live where the discrimination occurred should play a role in ensuring that civil rights laws are enforced in their local community. *Sepanski v. Janiking, Inc.*, 822 F. Supp. 2d 309, 316 (W.D.N.Y. 2011).[6]

In *Mayhew*, this Court declined to follow the reasoning from these cases, but the public interest in Mainers playing a role in enforcing the law here is stronger than in *Mayhew* because Mr. Luzingu took action to oppose Abbott's discrimination against many more Mainers, beyond himself, when he opposed Abbott's refusal to accommodate Muslim employees' religious practices. Thus, Mainers have a public interest not only in holding Abbott accountable for its retaliation and discrimination against Mr. Luzingu, but also in ensuring Abbott reasonably accommodates all its employees' religious practices.[7]

## C. The FSC is unenforceable because it is a product of overreaching.

The FSC is also unenforceable because it is overreaching to the point of being both procedurally and substantively unconscionable. FSCs are subject to the general principle that unconscionable contractual provisions are invalid. *Jackson v. Payday Fin., LLC*, 764 F.3d 765,

---

[6] This Court has recognized that courts are split on how to analyze FSCs in employment discrimination cases. *Mayhew*, 2026 WL 323175, at *6. In *Mayhew*, this Court followed the case-by-case approach that the Second Circuit has taken to analyze the issue under the *Bremen* framework. *Id.* In the cases cited in footnote 5, *supra*, the courts took a different, *per se* approach and essentially applied the reasoning courts use to invalidate contracts which attempt to waive substantive statutory rights. *See e.g., Rumsey v. Int'l Bus. Machines Corp.*, 2025 WL 2823116, at *8 (D. Mass. Sept. 30, 2025) (ADEA statute of limitations could not be changed by employment agreement because it is a substantive right). Mr. Luzingu maintains that the *per se* approach is correct because Title VII's special venue provision creates a substantive right, but he also makes the alternative argument that the strong public policy reflected in Title VII's special venue provision should be considered in aggregate with the other factors here counselling against enforcement of an FSC under the *Bremen* framework.

[7] Abbott argues that the cases cited in footnote 5, *supra*, are unpersuasive because they pre-date and do not incorporate the reasoning from *Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49 (2013). But *Atlantic Marine* did not change the test that courts use when they consider whether an FSC is unenforceable for public policy reasons. As discussed above, the First Circuit makes this determination under the test set forth in the Supreme Court's 1972 *Bremen* decision, which requires courts not to enforce FSCs if their enforcement would contravene a strong public policy. Further, even according to *Atlantic Marine*, courts should not enforce an FSC if doing so would contravene the public interest. *Atlantic Marine*, 571 U.S. at 64. The holdings of the cases cited in footnote 5 are all rooted in public-interest factors, and their reasoning fits within the "unreasonable and unjust" standard that the First Circuit applies. *Claudio-De Leon*, 775 F.3d at 48.

14

778 (7th Cir. 2014). The FSC here both lacks mutuality of consideration and endeavors to make Mr. Luzingu's enforcement of his rights so impractical that it effectively denies him his day in court. *See Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ("manifestly one-sided" contract was unconscionable). Indeed, because of this impracticality, Illinois recently enacted a law that prohibits FSCs that require employees in Illinois to litigate employment discrimination claims in other states. 820 Ill. Comp. Stat. Ann. 96/1-25(b) (effective January 1, 2026).

Under Illinois law,[8] courts may invalidate a contract based on its procedural unconscionability **or** its substantive unconscionability. *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006); *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006). Procedural unconscionability generally refers to the exploitation of unequal bargaining power between the parties. *American Airlines v. Wolens*, 513 U.S. 219, 249 (1995) (O'Connor, J., concurring) ("[P]rocedural unconscionability is broadly conceived to encompass not only the employment of sharp practices and the use of fine print and convoluted language, but a lack of understanding and an inequality of bargaining power.") (citation modified). Substantive unconscionability refers to those terms that are inordinately one-sided in one party's favor. *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 647 (Ill. 2011). Both the conditions at the formation of the Agreement here and the Agreement's terms render the contract overreaching and unconscionable.

**1.  The FSC is procedurally overreaching and unconscionable.**

The core of procedural unconscionability is "some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. App. 1st 1980). "Procedural unconscionability refers

---

[8] The choice of law on enforceability of FSCs is generally an open question. *See* Patrick Woolley, *Erie and the Enforceability of Forum Selection Clauses*, 74 Am. U. L. Rev. 759 (2025). But because the Agreement includes a choice-of-law clause calling for the application of Illinois law, Ex. 1 at ¶ 15, and because Illinois law appears to be consistent with the federal common law on contracts, Mr. Luzingu will refer to Illinois law on this issue.

to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Razor*, 854 N.E.2d 607 at 622. "Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Phoenix Ins. Co.*, 949 N.E.2d at 647. Here, each of these factors demonstrates the procedural unconscionability underlying Abbott's adhesive Agreement.

**First**, Abbott offered the Agreement to Mr. Luzingu on a take-it-or-leave-it basis in a context where it had superior bargaining power and, thus, the Agreement is a textbook contract of adhesion. *See, e.g.*, *Barrett v. McDonald Investments, Inc.*, 870 A.2d 146, 155 (Me. 2005) (Alexander, J., concurring) ("The defense of unconscionability may be asserted to a contract of adhesion 'exacted by the overreaching of a party'") (citation modified)). While a disparity in bargaining power is insufficient on its own to invalidate a contract, a party's wrongful use of such a disparity will render the contract unenforceable. *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 366–67 (7th Cir. 1999); *Crown Mortg. Co. v. Young*, 989 N.E.2d 621, 624 (Ill. App. Ct. 2013).

Not only did an enormous power imbalance exist between Abbott and Mr. Luzingu, but Abbott used that imbalance to force Mr. Luzingu into a contract that effectively deprived him of his ability to enforce his statutory rights because of the FSC. *Jackson*, 764 F.3d at 780 n.39. Mr. Luzingu fled religious persecution in Angola only three years before Abbott presented him with this adhesive Agreement. Luzingu Decl. ¶¶ 15, 22, 25. In that time, Mr. Luzingu was preoccupied with taking English classes in an adult education program, building a new religious community, and seeking asylum. *Id.* ¶¶ 13-16, 29. He, like many recent immigrants fleeing persecution, did

16

not have many lucrative employment opportunities.[9] *Id.* ¶ 23. Abbott's employment offer gave Mr. Luzingu his best chance at supporting his family and his church while navigating the United States' complex immigration system. *Id.*

**Second**, the FSC was "hidden in a maze of fine print." *Frank's Maintenance*, 408 N.E.2d at 410. "[B]oth the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability." *Id.* The FSC was neither conspicuous nor negotiated. It is located on page six, section 16 of the Agreement. It appears in a block of text and is comprised of a tangle of legalese that is difficult to parse even for trained legal professionals. *Kinkel v. Cingular Wireless, LLC*, 828 N.E.2d 812, 819 (Ill. App. Ct. 2005) (procedural unconscionability found because provision located "where it was unlikely to be noticed, much less read").

When Abbott presented the Agreement electronically to Mr. Luzingu, he was still taking adult education English classes. Luzingu Decl. ¶¶ 15, 22. Abbott knew he was a recent immigrant authorized to work via a United States issued work permit. *Id.* ¶ 22. Despite knowing Mr. Luzingu's limited English proficiency, Abbott did not offer to help Mr. Luzingu understand the intricacies of how the FSC would require him to forfeit his rights. *Id.* ¶ 27. Rather, it pressured him to sign quickly and uncritically.[10] *Id.* Mr. Luzingu did not understand and Abbott did not explain that, by signing the Agreement, he would have to pursue any claims against Abbott over a thousand miles away, as the concepts of "exclusive jurisdiction" and a judicial "forum" were

---

[9] The median annual earnings for an immigrant in their first year living and working in the United States is $22,000. *See Economic Projections for Asylum Seekers and New Immigrants: U.S. and State-Level Data*, Immigration Research Initiative (Feb. 7, 2024), https://immresearch.org/publications/economic-projections-for-asylum-seekers-and-new-immigrants-u-s-and-50-states/. That number rises to roughly $32,000 annually after five years of work. *See id.*

[10] It strains credulity to describe the method by which Mr. Luzingu was told to give his assent to the terms of the Employment Agreement as "signing." Rather, Mr. Luzingu was sent a link through Abbott's personnel software, told to open the Employment Agreement, click a box that says he agreed to the terms, and then click a button submitting the "signed" Agreement. Luzingu Decl. ¶ 28.

17

completely foreign to him. *Id.* ¶ 30; *see Rideout v. CashCall, Inc.*, No. 216-CV-02817, 2018 WL 1220565, at *7 (D. Nev. Mar. 8, 2018) (contract provision procedurally unconscionable because "an average person untrained in the law would not know" what rights they agreed to waive when signing the contract).

**Third**, Mr. Luzingu never received a "reasonable opportunity to understand the terms of" the FSC. *Frank's Maintenance*, 408 N.E.2d at 410; *see* Luzingu Decl. ¶ 27. Abbott did not even give Mr. Luzingu a written copy of the Agreement to sign. Luzingu Decl. ¶ 27. Instead, Abbott provided him access to the Agreement on its employee personnel software, pressuring him to sign it quickly, which only required clicking twice, so that he could begin his new role. *Id.* ¶¶ 27-28; *see Razor*, 854 N.E.2d 607 at 622 (listing as "facts which tend to support a finding of unconscionability," that the plaintiff "had no hand in [the contract's] drafting, and no bargaining power at all with respect to its terms"). Viewing the full circumstances surrounding the Agreement's formation, Abbott plainly manipulated Mr. Luzingu into signing an unclear and unfair Agreement with the knowledge that he would not fully grasp the breadth of rights the FSC required him to sign away. *Rosen*, 949 N.E.2d at 647.

### 2. The FSC is substantively overreaching and unconscionable.

This Court can also refuse to enforce the FSC based, at least in part, on the substantive overreaching and unconscionability of its one-sided terms. "Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed, asking whether the terms are so one-sided as to oppress or unfairly surprise an innocent party." *Rosen*, 949 N.E.2d at 647 (quotation marks omitted). Specifically, when evaluating the substantive unconscionability of a contract, Illinois courts consider whether a contract contains "terms so one-sided as to oppress or unfairly surprise an innocent party" and "an overall imbalance in the obligations and rights imposed by the bargain." *Kinkel*, 857 N.E.2d at 267.

18

The FSC contains a drastically unequal dispensation of obligations and rights, something Illinois courts find particularly indicative of unconscionability. *Young*, 989 N.E.2d at 625 (holding an agreement unconscionable because the "terms epitomize the overall imbalance in the obligations and rights imposed by a bargain") (citation modified). Abbott included a reservation of rights provision in the Agreement that, by its plain language, gave Abbott the unilateral power to change the terms of the FSC. Ex. 1 at § 19. This left Mr. Luzingu unable to ascertain the very "rules to which they were agreeing," *Jackson*, 764 F.3d at 781, because Abbott retained the right to change those rules in its "sole discretion." The FSC permits Abbott to violate Mr. Luzingu's rights in Maine, and drag him thousands of miles away to vindicate them, while Abbott remains free to escape the requirements of the FSC whenever convenient. Effectively, Abbott sought to price Mr. Luzingu out of enforcement of his rights by forcing him into an adhesive Agreement with an FSC that drags him away from his home if he tries to sue. *See Potiyevskiy v. TM Transp., Inc.*, 2013 IL App (1st) 131864-U, ¶ 32 (Ill. App. Ct. 2013) (noting that a challenged contract provision imposed such unrealistic procedural obligations on workers to vindicate their rights that the contract was "illusory and patently unreasonable."). For all these reasons, the Court should deny Abbott's motion because the FSC is unconscionable.[11]

**D. Enforcement of the FSC would create such grave difficulty for Mr. Luzingu that, for all practical purposes, he would not get his day in court.**

The Court should deny Abbott's motion because the FSC would force Mr. Luzingu away from his community to litigate in a forum over a thousand miles from his home, church, family,

---

[11] In *Mayhew*, this Court relied on Abbott's arguments, which the plaintiffs there did not challenge as Plaintiff does here, to hold that the reservation of rights clause in the Agreement does not provide Abbott with the right to unilaterally change the FSC. *Mayhew* 2026 WL 323175, at *3. As discussed below, Abbott's arguments on this issue are incorrect. Regardless, even under Abbott's position, Section 19 of the Agreement gives Abbott the ability to act in any way it chooses without waiving its rights under the FSC, while employees like Mr. Luzingu do not have that ability. Thus, the one-sided nature of the FSC still contributes to the evidence of overreaching here.

19

and where the discrimination occurred, effectively depriving him of his day in court. *See Amyndas,* 48 F.4th at 33. **First**, Mr. Luzingu would shoulder an unreasonable financial burden to litigate this case in Illinois.[12] Mr. Luzingu is the sole breadwinner for his family of eight. Luzingu Decl. ¶¶ 7, 49-50. He and his family live paycheck to paycheck with all his salary going to necessities such as food, housing, and debts. *Id.* ¶¶ 47-50. Litigating in Illinois would require him to take on burdensome debt to fund his travel, lodging, and various expenses. *Id.* Put simply, if the Court required him to litigate his claims in Illinois, the financial burden combined with the factors related to his pastoral duties and the stress on him and his parishioners because of increased immigration enforcement would, for all practical purposes, deny Mr. Luzingu his day in court. *Id.*

**Second**, Mr. Luzingu would suffer anxiety and torment if he could not lead his parishioners' religious practices while he was in Illinois. These feeling of dereliction of his ministerial duties would undoubtedly distract Mr. Luzingu and divide his attention during court proceedings. Luzingu Decl. ¶¶ 45-47. Mr. Luzingu will be a key witness in this case, and it would be fundamentally unfair to require him to perform his role as a private attorney general while at the same time forcing him to worry and stress that his parishioners' religious needs will go unmet.

The parishioners' needs for spiritual guidance and comfort through Mr. Luzingu, his preaching, and their church is greater now than it has ever been based on the surge of immigration law enforcement in Maine and across the nation. *Id.* ¶¶ 38-43. Most of Mr. Luzingu's parishioners are recent immigrants from of Central African who have good reason to fear the surge in immigration law enforcement because they have pending asylum applications. *Id.* ¶¶ 37-43.[13]

---

[12] Courts have held that severe financial burden on a plaintiff can render a FSC unenforceable. *See e.g., Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1143 (9th Cir. 2004); *Franklin v. Cleo AI Inc.*, 741 F. Supp. 3d 300, 313 (D. Md. 2024); *Montoya v. CRST Expedited, Inc.*, 285 F. Supp. 3d 493, 499 (D. Mass. 2018); *Sanchez-Santiago v. Guess, Inc.*, 512 F. Supp. 2d 75, 80–81 (D.P.R. 2007).

[13] Individuals who are lawfully complying with the asylum process are frequently arrested, incarcerated, and even deported by ICE. *See* Miriam Jordan et al., *They Had 'Done Everything Right.' ICE Detained Them Anyway*, New York Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/26/us/politics/ice-minnesota-refugees.html.

Immigration and Customs Enforcement (ICE) officers have arrested at least four of Mr. Luzingu's parishioners and incarcerated them for weeks in a different state before releasing them without any guarantee that they will not be arrested again. *Id* ¶ 37. One parishioner became so overwhelmed with fear of violent arrest and incarceration that she attempted to take her own life, but Mr. Luzingu successfully intervened to save her. *Id.* ¶ 43.

**Third**, Mr. Luzingu is also a potential target for ICE harassment, making travel, particularly air travel, unsafe and unduly burdensome. Mr. Luzingu was born in Angola, is noticeably Black, and speaks English with an accent that identifies him as having immigrated to the United States. *Id.* ¶¶ 3,39-40. Unfortunately, despite the approval of his asylum application in 2025, the above characteristics make him a target for ICE agents.[14] Indeed, ICE agents have stopped and questioned Mr. Luzingu and his wife multiple times. Luzingu Decl. ¶¶ 39-40. These multiple encounters with ICE, without any articulation of the reason for the stops, highlights the danger that travel poses to Mr. Luzingu and his community members. Air travel, which is the only practical method for Mr. Luzingu to travel to and from Illinois, magnifies that danger.[15] For these reasons, the Court should deny Abbott's motion to prevent the practical effect of denying Mr. Luzingu his day in court.

## II.    The FSC is unenforceable because the Agreement is illusory.

Separate from the reasons above based on the *Bremen* framework, the Court should also deny Abbott's motion because the Agreement is illusory and, thus, invalid. *Ulitmate Nutrition,*

---

[14] *See* Morgan Womack et al., *Portland, South Portland police texted with immigration agent during surge operation in Maine*, Portland Press Herald (Mar. 12, 2026), https://perma.cc/WY9B-YGK9 (highlighting leaders of ICE agents expressing hostility for and bigotry towards African immigrants).

[15] *See Community Alert: Immigration Arrests at Airports*, National Immigration Law Center (Dec. 18, 2025), https://www.nilc.org/resources/community-alert-immigration-arrests-at-airports/ (discussing the elaborate collaboration between TSA and ICE).Indeed, the federal government recently began to deploy even more ICE agents to airports to ease the burden on TSA agents. *See* Seung Min Kim et al., *ICE Officers will begin assisting TSA as shutdown frustrates travelers and screeners*, Associated Press (Mar. 23, 2026), https://apnews.com/article/ice-tsa-airport-security-shutdown-mullin-lines-772fd0e633c5d069bfa41b24a6c1481a.

*Inc. v. Leprino Foods Co.*, 707 F. Supp. 3d 199, 207 (D. Conn. 2023) (when parties did not form a valid contract the FSC in the contract cannot be enforced under general contract law principles). Abbott included a reservation of rights clause in the adhesive Agreement it required Mr. Luzingu to sign that rendered all its promises in the Agreement illusory. *Snow v. BE & K Const. Co.*, 126 F. Supp. 2d 5, 15 (D. Me. 2001). When an "employer reserves the right to make unilateral changes in an employee contract without giving the employee an opportunity to decide whether to accept those new terms by continuing employment," the contract is "illusory and unenforceable." *Canales v. Univ. of Phoenix, Inc.*, 854 F. Supp. 2d 119, 124–25 (D. Me. 2012).[16]

The "Waiver" provision of the Agreement includes a reservation of rights clause stating that "Abbott has the right to . . . modify, change, clarify or interpret the Agreement in its sole discretion." *See* Ex. 1 at § 19. Under *Snow* and *Canales*, because Abbott could "change" or "modify" the Agreement at any time "in its sole discretion," all its promises in the Agreement were illusory and could not serve as consideration for the Agreement.

In *Mayhew*, this Court distinguished the Agreement from the putative contracts in *Snow* and *Canales* based on the following arguments made by Abbott: (A) the contextual language in the Waiver provision, surrounding the reservation of rights clause, implies that the clause "only concerns Abbott's ability to waive the [employee's] performance" of obligations in the Agreement; and (B) the Agreement requires Abbott to write down changes or modifications to the Agreement and, presumably, present that writing to the employee so that the employee has an opportunity to accept or reject the modified Agreement. *Mayhew* 2026 WL 323175, at *3. The

---

[16] Despite the choice-of-law clause in the Agreement, Maine law applies to whether the Agreement is illusory because the Court must consider whether a valid contract was formed in the first place—in Maine—before applying the choice-of-law clause in the Agreement. *Kaur v. World Bus. Lenders, LLC*, 440 F. Supp. 3d 111, 117 (D. Mass. 2020).

22

plaintiffs did not rebut these arguments, and the Court adopted Abbott's position. But Abbott's arguments are erroneous.

**First**, if the reservation of rights clause only concerned Abbott's ability to waive an employee's performance of obligations under the Agreement, it would be superfluous, because the Waiver provision would still provide Abbott with the ability to waive an employee's performance even if the reservation of rights clause were struck from the provision. When interpreting contracts, courts "avoid an interpretation that renders meaningless any particular provision of the contract." *Pelkey v. Gen. Elec. Cap. Assur. Co.*, 804 A.2d 385, 388 (Me. 2002). Thus, courts do not interpret contracts in ways that would render a "particular word, clause, or phrase meaningless or relegate[] it to the category of mere surplusage." *Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004). As shown below, the Waiver provision would still provide Abbott the ability to waive employee's performance obligations under the Agreement if the reservation of rights clause were struck:

> **Waiver.** The failure or refusal by ABBOTT either to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a custom or practice contrary to such provision or right of this Agreement. ABBOTT has the right to waive the enforcement of any provision(s) in this Agreement, ~~as well as modify, change, clarify or interpret the Agreement in its sole discretion~~ but such waiver must be in writing and signed by an ABBOTT Corporate Officer or his/her delegate to be valid.

Thus, to avoid rendering the reservation of rights clause mere surplusage, it must do more than avoid waiving enforcement, and its plain language means that Abbott can change the Agreement in its "sole discretion."[17] But even if the reservation of rights clause were ambiguous, when interpreting contracts—particularly adhesive contracts like the Agreement here—courts

---

[17] While the heading "Waiver" implies that the waiver of rights under the Agreement is the main topic of the provision, a "title or heading should never be allowed to override the plain words of a text." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 222 (2012); *see also Fulton*, 593 U.S. at 536 (interpreting contract provision to sweep more broadly than its heading).

must construe ambiguities against the drafter. *Barrett v. McDonald Investments, Inc.*, 870 A.2d 146, 150 (Me. 2005). This canon of interpretation, called "*contra proferentem*," means that "he who speaks should speak plainly, or the other party may explain to his own advantage." *Id.* (citation modified). When applying the *contra proferentem* canon, courts adopt the contract interpretation that will advantage the non-drafter *in the litigation*, not just an interpretation that is generally more favorable to the non-drafter. *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 24 (1st Cir. 2000) (citing Restatement (Second) of Contracts § 206, cmt. a); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) (interpreting contract to benefit non-drafter in litigation,).

In *Mayhew*, this Court determined that the appropriate way to construe the Agreement against Abbott was to interpret it to prohibit Abbott from unilaterally modifying it. But that approach violates the rule that the *contra proferentem* canon should be applied to advantage Mr. Luzingu *in this litigation*, meaning the reservation of rights language should be interpreted broadly, rendering the contract illusory and unenforceable against Mr. Luzingu.[18]

**Second**, the Agreement is illusory because it does not include language that would require Abbott to provide employees with an opportunity to accept or reject Abbott's changes to the Agreement. The Court held in *Mayhew* that the following italicized language means that employees would have an opportunity to accept or reject Abbott's changes to the Agreement:

> ABBOTT has the right to waive the enforcement of any provision(s) in this Agreement, as well as modify, change, clarify or interpret the Agreement in its sole discretion *but such waiver must be in writing and signed by an ABBOTT Corporate Officer or his/her delegate to be valid.*

---

[18] In *Mayhew*, this Court relied on *Stenzel v. Dell, Inc.*, 870 A.2d 133 (Me. 2005), but *Stenzel* was decided under Texas law and, thus, has limited value when applying Maine law. See *Barrett*, 870 A.2d at 151 n.4 (distinguishing *Stenzel* and its application of *contra proferentem* canon because *Stenzel* was decided under Texas law). Indeed, Texas takes a far different view than Maine on the enforceability of illusory contracts. *Canales*, 854 F. Supp. 2d at 125, n.4 (noting Texas is in the minority on this issue).

24

Ex. 1 at § 19 (referred to below as the "in writing" requirement). But this interpretation in *Mayhew* departs from the sound reasoning in *Canales*. The putative contract in *Canales* contained a similar "in writing" requirement, and the court held that the defendant could have inserted that requirement merely to ensure it had an internal record of any change to the putative contract, not to give the employee an opportunity to reject the change. *Canales*, 854 F. Supp. 2d at 124. That same judicial reasoning applies equally here. Indeed, given the context of this Agreement, it would be odd to interpret it to provide any benefits to Abbott's employees, since Abbott wrote the Agreement to have no provisions benefitting employees; it purports to provide them with the freedom of at-will employment, but they would have enjoyed that legal right even without the Agreement. This overall context of a completely one-sided contract written solely by Abbott undermines any inference that the Agreement provides employees with the benefit of an opportunity to reject Abbott's changes to it. And making such a presumption, which would favor Abbott in this litigation over its FSC, would violate the rule that the *contra proferentem* canon should be applied to advantage Mr. Luzingu *in this litigation*.

Further, the "in writing" requirement only applies to a "waiver" by Abbott of an employee's performance of obligations under the Agreement. It does not apply when Abbott exercises its power to "modify, change, clarify or interpret" the Agreement. And while this Court found that the "in writing" requirement gives employees an opportunity to reject Abbott's changes to the Agreement by resigning their employment, *Mayhew*, 2026 WL 323175 at *3, that option is undermined by the terms in  the Agreement that continue to bind employees even *after* they separate from Abbott. For example, the Agreement's non-compete and non-solicitation provisions (Ex. 1 at §§ 9-10) expressly bind employees after their separation. Thus, Abbott could present to a current employee a written change to one of these provisions and even if the employee

25

immediately resigned they would be powerless, under the terms of the Agreement, to reject the unilateral change made by Abbott.

In *Mayhew*, the Court also applied Section 204 of the Restatement (Second) of Contracts to hold that it could add language to the Agreement which would require Abbott to provide employees with the ability to reject Abbott's changes to the Agreement. *Mayhew*, 2026 WL 323175 at *3 n.2. Section 204 allows courts, primarily in commercial settings, to add omitted terms to a contract, but courts may only do that once they have determined that a valid contract has been formed. Thus, courts must first determine whether a contract is illusory before they may move on to determine whether Section 204 permits the addition of an omitted contract term. *Howell v. United States*, 51 Fed. Cl. 516, 521 (2002).[19] Because the Agreement is illusory, Section 204 does not permit the Court to add language to cure this defect.

Section 204 also cannot cure the illusory nature of the Agreement because it only allows courts to add language and does not permit courts to *remove* contract language. Abbott reserves "sole discretion" to change the Agreement under the reservation of rights clause. The Court would need to remove that "sole discretion" language to give employees the right to reject changes to the Agreement, because otherwise Abbott would no longer have "sole discretion" to make changes. *Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169, 180 (4th Cir. 2025) (refusing to infer right for credit card holder to reject changes to agreement because agreement gave defendant "sole discretion" to make changes). Abbott clearly drafted the Agreement solely to benefit itself, and it overreached with this reservation of rights clause. Especially under these circumstances, the Court should not re-write this adhesive Agreement to rescue Abbott from "a sinkhole of its own design." *RCI Ne. Servs. Div. v. Bos. Edison Co.*, 822 F.2d 199, 205 (1st Cir. 1987).

---

[19] Similarly, in *Cambridge Cap. LLC v. Ruby Has LLC*, the court refused to use Section 204 to add a term to a contract because no valid contract had been formed in the first place. 675 F. Supp. 3d 363, 441 (S.D.N.Y. 2023).

26

**III.    If the Court grants Abbott's motion, transfer is the appropriate remedy, not dismissal, and the Court should certify an appeal to the First Circuit before effectuating the transfer.**

If this Court decides to enforce the FSC, the proper remedy is to transfer the case to the Northern District of Illinois, not dismissal.[20] Additionally, if this Court decides to grant Abbott's motion to transfer, Mr. Luzingu requests that the Court certify this case for interlocutory appeal to the First Circuit because (1) there is "substantial ground for difference of opinion," 28 U.S.C. § 1292(b), on the enforceability of FSCs in Title VII cases, s*ee* footnote 5 *supra*; (2) this case presents a recurring issue because Abbott appears to have routinely required its employees to sign the Agreement; and (3) an appeal now would save the parties from proceeding through trial in Illinois, appealing to the Seventh Circuit, and potentially starting the litigation all over again in Maine if Mr. Luzingu prevailed at the Seventh Circuit on this issue.

### Conclusion

Because Abbott's FSC is unenforceable under the mandatory *Bremen* analysis and Abbott does not make any argument for transfer apart from attempting to enforce its FSC, this Court need not even consider whether transfer of venue would be warranted on other grounds. Thus, the Court should deny Abbott's Motion to Dismiss or Transfer in its entirety.

---

[20] As this Court noted in *Mayhew*, "a district court should 'ordinarily' use § 1404(a) to enforce a [FSC] that identifies a federal forum." *Mayhew*, 2026 WL 323175, at *2. Abbott does not, nor can it, explain why the Court should deviate from the ordinary course and dismiss this case. When faced with a joint motion for dismiss or transfer, courts in the First Circuit will opt to transfer if it is "in the interest of justice." *Lewis v. Hill*, 683 F. Supp. 3d 137, 153 (D. Mass. 2023). It is plainly in the interest of justice to allow Mr. Luzingu to litigate his claims. Among the many factors favoring transfer over dismissal are that the statute of limitations on Mr. Luzingu's Title VII and MHRA claims have run, and Mr. Luzingu's "allegations are serious, and in this lawsuit, he seeks to remedy a substantial financial loss." *Bearse v. Main St. Invs.*, 170 F.Supp.2d 107, 117 (D. Mass. 2001); *see also Cormier v. Fisher*, 404 F. Supp. 2d 357, 363 (D. Me. 2005) (transfer ordered, instead of dismissal, because statute of limitations had run).

Respectfully submitted,


Date:   April 3, 2026

/s/ David G. Webbert
David G. Webbert
Johnson, Webbert & Beard, LLP
1 Bowdoin Mill Island, Ste 300
(207) 623-5110
dwebbert@work.law


/s/ Allan K. Townsend
Allan K. Townsend
Johnson, Webbert & Beard, LLP
1 Bowdoin Mill Island, Ste 300
Topsham, ME 04086
(207) 623-5110
atownsend@work.law


/s/ Ryan M. Schmitz
Ryan M. Schmitz
Johnson, Webbert & Beard, LLP
1 Bowdoin Mill Island, Ste 300
Topsham, ME 04086
(207) 623-5110
rschmitz@work.law

*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that on April 3, 2026, I electronically filed this filing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Date:   April 3, 2026

/s/ Allan K. Townsend
Allan K. Townsend
Johnson, Webbert & Beard, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: 207-623-5110
dwebbert@work.law